In the Interest of D.P., Minor

Appeal of A.M.

In the Interest of D.M., Minor

Appeal of A.M.

In the Interest of J.M., Minor

Appeal of A.M.

Superior Court of Pennsylvania.

Submitted Feb. 23, 2009.
Filed May 6, 2009.

Pamela J. Kauffman, Lancaster, for appellant.

David E. Alspach, Lancaster, for Lancaster County, appellee.

Cynthia L. Garmon, Lancaster, Guardian Ad Litem.

BEFORE: PANELLA, SHOGAN and KELLY, JJ.

OPINION BY SHOGAN, J.:

¶ 1 In these consolidated appeals, Appellant, A.M. ("Mother"), appeals from the

dispositional order in dependency proceedings which changed the permanency goal for Mother's three male children, D.P. (D.O.B. 2/2/94), D.M. (D.O.B. 12/23/95), and J.M. (D.O.B. 3/9/98) (collectively, "Children"). The Children were previously adjudicated dependent pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.* In the order on appeal, the trial court changed the goal for the family from reunification to adoption, and ordered a concurrent permanency goal of "placement in another planned living arrangement intended to be permanent."[1] We affirm.

¶ 2 The trial court's Opinion sets forth the extensive procedural history of this case and makes numerous factual findings. We will recite only those parts of the trial court's opinion that bear upon this appeal.

¶ 3 The Lancaster County Children and Youth Social Services Agency ("Agency") first became involved with Mother and her children in July, 1998, when Mother was arrested in the course of a drug raid. At that time, it was reported that, during the raid, Mother was smoking crack cocaine in front of her four children, who included D.P., D.M., and J.M.[2] Protective services were provided to the family. After Mother completed her goals in the Family Service Plan, the Agency closed the case on August 25, 2000.

¶ 4 Next, on April 28, 2004, the Agency received a report that Mother was not properly supervising her children. Thus, on May 21, 2004, the Agency filed a petition for legal custody of the Children. The Children were found to be dependent, pursuant to 42 Pa.C.S.A. § 6302(1),[3] and physical custody was given to the Agency. A new, second Family Service Plan was approved to address Mother's drug addiction, the Children's educational needs, stable and sanitary housing, Mother's supervision of the Children, stable and adequate income, parenting education, and provision of the Children's basic needs. Thereafter, Mother made minimal progress on her plan and was uncooperative with the Agency. Although the Agency continued to have concerns about the Children, the Children were attending school and their basic needs were being met. Accordingly, the Agency filed a petition to release custody of the Children. The trial court granted the petition on April 4, 2005, and custody was returned to Mother.

¶ 5 On July 26, 2005, the Agency received a referral alleging that Mother was again actively using cocaine, and that her addiction was negatively impacting the Children. On August 19, 2005, the Agency filed a petition requesting custody of the Children. At Mother's request, on August 23, 2005, the trial court continued the matter to September 20, 2005. As part of the continuance order, the trial court listed a set of eight conditions with which Mother

---

1. The trial court noted that the Children's father ("Father") has not pursued any interest in having custody, and that he did not participate in the hearings in this matter. Further, the trial court stated that aggravated circumstances were determined to exist against Father on June 26, 2006, based on his lack of interest or involvement. Trial Court Opinion, 10/9/08, at 2–3.

2. The fourth child has attained the age of majority and is not subject to this litigation.

3. Pursuant to the Juvenile Act, a dependent child is defined as a child who:

(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302.

was required to comply. These conditions included, *inter alia*, requirements that Mother allow unannounced home visits and submit to random unannounced drug screens. The trial court further directed the Agency to immediately file a petition for physical custody of the Children if Mother failed to comply with any of the conditions in the order.

¶ 6 Immediately after the court session on August 23, 2005, the Agency caseworker visited Mother's home. The home was found to be in a state of disarray. Clothes were scattered throughout the home and were piled up in the various rooms, and the home's floors were dirty and littered with trash. There were beer cans inside the home and in the recycling bin outside of the home. At this same home visit, Mother tested positive for cocaine. Mother denied any drug use, but agreed to make arrangements for her children to stay with her mother until she could access drug treatment and provide the Agency with clear urine screens. These arrangements were short term, however, because the maternal grandmother resided in a recreational vehicle at a campground, and she was leaving in October 2005 to travel during the winter months.

¶ 7 On August 24, 2005, the Agency filed a petition for physical and legal custody of the Children. The trial court granted the Agency immediate temporary custody. The trial court held a Shelter Care Hearing on August 29, 2005, and, at that time, ordered that the Agency would retain custody of the Children until the Adjudication/Disposition hearing scheduled for September 20, 2005.

¶ 8 At the hearing on September 20, 2005, the trial court found the Children to be dependent, and continued them in the custody of the Agency. The trial court also approved Child Permanency Plans, setting forth numerous goals for Mother to address in order to achieve reunification with the Children. The Primary Permanency Goal in the plans was "Return to parent, guardian or other custodian."

¶ 9 A Master held a review hearing on February 6, 2006. The Master's recommendation noted that Mother was making substantial progress toward compliance with her plan components. The trial court approved the Master's recommendation, and continued the Children in the care of the Agency.

¶ 10 At a subsequent review hearing on June 26, 2006, the Master found that Mother had completed group counseling, but she was terminated from individual counseling for missed appointments, and that she no longer had employment. The Master characterized Mother's compliance with her plan as "partial." The Master found aggravated circumstances with regard to Father, because of his lack of contact with the Children. The goal for the Children remained to return home to Mother.

¶ 11 On November 30, 2006, the Master held another review hearing. The Master found Mother in substantial compliance with her plan, but noted that Mother would be charged with felony and misdemeanor charges related to identity theft. The Master also indicated that Mother had done well on all other aspects of her Child Permanency Plan, and, if not for the criminal charges, the Children would be transitioning home. The Master also stated that, if Mother's criminal charges could be resolved, the Children would be able to return home in a reasonable period of time.

¶ 12 The Master next conducted a review hearing on April 30, 2007. In the intervening time since the previous review hearing, Mother had been charged with three felonies and two misdemeanors. The Master found that Mother was in partial compliance with her plan. The Master

noted that Mother was incarcerated in December of 2006 based on felony charges, and the Master included a finding that Mother was to address her improper usage of the Children's social security numbers. The Master added the goal of maintaining a crime-free lifestyle to Mother's plan. The Master also stated that the then-current placement goal of return home was appropriate, but indicated that termination of parental rights and goal change petitions would be filed. The trial court adopted the Master's recommendation.

¶ 13 On September 18, 2007, a Master held a subsequent permanency review hearing. The Master found Mother to be in substantial compliance with her permanency plan, but found that she still needed to complete parenting classes and to resolve the criminal charges against her. The Master ordered D.M. to remain in the legal and physical custody of the Agency, increasing the visitation between Mother and D.M., with the goal of transitioning him to home. The review order for J.M. made the same findings. Regarding D.P., the oldest of the three children, however, the review order returned him to Mother's physical custody.

¶ 14 On October 11, 2007, Mother filed a Petition to Transition Children Home, citing the positive review findings regarding Mother from the review hearing of September 18, 2007. In the petition, Mother asserted that she had cooperated with the court regarding her outstanding criminal charges, but claimed that she was not in a position to expedite the resolution of the outstanding charges. Mother also asserted that the Agency had not complied with the court order because Mother's visitation with J.M. and D.M. had not been increased to transition them home. The trial court, by an order entered on October 18, 2007, granted Mother relief, and ordered transitional visits with Mother. Additionally, the trial court ordered the Agency to schedule a hearing before a judge to review the progress.

¶ 15 As a result of postponement, a Master conducted the review hearing on March 4, 2008. The Master recommended, and the court approved, an order which returned physical custody of D.M. and J.M. to Mother, with legal custody remaining with the Agency. D.P. continued to remain in the physical custody of Mother, and the Agency retained legal custody of him. Mother was directed to abide by a new Family Service Plan that was to be submitted.

¶ 16 On April 11, 2008, the Agency filed new petitions seeking the return of D.M. and J.M. to the Agency's physical custody. The petitions alleged that Mother had violated the Family Service and Safety plans that were in place, in that D.M. and J.M. had missed numerous therapy sessions while they were in Mother's care, and that Mother had permitted an unidentified adult male to reside in her home with the Children. Based upon the allegations in the petitions, the trial court ordered that the Agency would have temporary custody.

¶ 17 After the hearings were continued, on April 23, 2008, upon agreement by the Agency, Mother and the guardian *ad litem,* the trial court entered orders retaining D.M. and J.M. in the legal and physical custody of the Agency pending a dispositional hearing, which was scheduled for May 21, 2008. On May 9, 2008, the Agency presented a petition for the return of D.P. to the Agency's physical custody. The Agency alleged, *inter alia,* that D.P. had left Mother's home after witnessing Mother consume illegal drugs with an unidentified adult male. The trial court granted the request in a temporary order. On May 16, 2008, the trial court held a Shelter Care hearing, and D.P. was ordered to be retained in the Agency's physical and legal custody.

¶ 18 Because all three Children had already been ruled dependent, a disposition hearing was commenced on June 2, 2008, and continued to July 2, 2008, for additional testimony. Following the conclusion of testimony, on July 10, 2008, the trial court entered orders with regard to each of the Children that found they continued to be dependent, and which retained legal and physical custody in the Agency. The trial court approved new Child Permanency Plans. In these plans, the Primary Permanency Goal was changed to "Place for Adoption," and the Concurrent Placement Goal directed, "Placement in another planned living arrangement intended to be permanent."

¶ 19 On August 8, 2008, Mother filed timely notices of appeal from the dispositional order. Thereafter, on August 12, 2008, the trial court entered orders directing Mother to file a Concise Statement of Errors Complained of on Appeal, pursuant to Pa.R.A.P. 1925(b), within twenty-one days. Mother complied by filing her Rule 1925(b) Statements on August 21, 2008.[4]

¶ 20 The questions before the Court are: 1) whether the trial court erred in failing to give Mother a Child Permanency Plan to complete; 2) whether the trial court erred in not giving proper weight to the fact that Mother had completed a Child Permanency Plan and would be capable of completing an additional plan for the return of the Children; and 3) whether the trial court erred in not giving proper weight to the wishes of the Children, at ages 14, 13, and 10, to be returned to Mother. *See* Mother's Brief at 11. We will address Mother's issues together, as they are discussed in this fashion in Mother's brief.

¶ 21 Our scope and standard of review in dependency cases has been explained as follows.

[W]e must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination as opposed to the findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*In re C.M.*, 882 A.2d 507, 513 (Pa.Super.2005).

¶ 22 First, Mother contends that the Children who are the subjects of this appeal have present ties with her, and that she is an active force in their lives, so the court should have provided her with a Child Permanency Plan to complete. Mother argues that the standard governing the removal of a child from his or her parent, where the child has previously been returned to the physical custody of the parent, is whether there is a "clear necessity" for the removal, and not the "best interests of the child." In support of her argument, Mother relies on *In the Interest of Paul S.*, 380 Pa.Super. 476, 552 A.2d 288 (1988). Mother claims that, while

---

4. Mother also filed a motion for reconsideration, which the trial court denied on August 12, 2008.

the Agency presented testimony that she had difficulty with D.M. and J.M. attending therapy, the testimony did not negate the existence and quality of the emotional parent-child bond between them. Citing *In the Interest of James Feidler,* 392 Pa.Super. 524, 573 A.2d 587 (1990), Mother asserts that a clear necessity standard for separating a parent and a child is not shown where the children are removed from a home based on the parent's failure to cooperate with all parts of an agency's plan. Rather, she claims that the clear necessity standard is met when the evidence shows that alternatives to removal are not feasible. Here, Mother argues that the Agency failed to show that the alternative to removal, *i.e.,* reunification of the family, was not feasible. Mother urges that she has demonstrated an ability to provide basic needs of a structured environment, she is willing to parent the Children, and she is able to properly provide care for them.

¶ 23 Second, Mother asserts that the trial court should have examined the individual circumstances of the case and considered all of the explanations which she offered to determine whether, in light of the totality of the circumstances, the evidence warranted the court's not providing her with a reunification plan for the family. She argues that reunification with a parent is the most desirable goal. Mother contends that she had successfully completed a drug and alcohol program; that she had remained active in Narcotics Anonymous; that she had negative random drug screens; that she had successfully completed a mental health program; that she had successfully completed a parenting program; that she had been gainfully employed for more than five months; that she had appropriate housing; and that she consistently visited with the Children. Further, Mother asserts that, during the Children's placement in foster care, her goal was to complete a plan for the return

of the Children. Mother claims that, given the opportunity to so do, she is capable of completing a permanency plan. Mother stresses that none of the Children wished to be adopted, and that it does not serve their welfare for her not to have a permanency plan to complete.

¶ 24 Finally, Mother argues that the trial court should have placed greater weight on the Children's expressed desire to be reunited with her and their siblings. She claims that there was no clear and convincing testimony which negated the existence and quality of the emotional parent/child bond, and that there was no evidence that Mother posed a risk to the health, safety, and welfare of the Children. Mother asserts that continuity of the parent/child/sibling relationship is most important to the Children, and that the severing of that relationship could be extremely painful and emotionally damaging to them.

¶ 25 Further, Mother contends that her failure to have D.M. and J.M. in therapy on a regular basis should be examined under the totality of the circumstances. Mother asserts that she does not drive and was dependent upon others or public transportation to have them at therapy sessions. Mother claims that she wished to continue her therapy, at a location closer to home, and that she spoke with the caseworker regarding wrap-around services in the home for the Children, but the Agency did not provide such services. Relying on *In the Interest of Theresa E.,* 287 Pa.Super. 162, 429 A.2d 1150, 1158–1160 (1981), Mother urges that "proper parental care" is not the best care possible, but, at a minimum, is that care which is likely to prevent harm to the child.

■ ¶ 26 The cases cited above, upon which Mother relies in her brief, preceded the statutory mandates regarding planning for dependent children, and, thus, are not

controlling of the matter at hand. Our Supreme Court, in *In re Adoption of S.E.G.*, 587 Pa. 568, 570–572, 901 A.2d 1017, 1018–1019 (2006), explained the planning concepts as follows.

[C]oncurrent planning is a dual-track system under which child welfare agencies provide services to parents to enable their reunification with their children, while also planning for alternative permanent placement should reunification fail....

[T]he United States Congress enacted the Adoption and Safe Families Act of 1997, Pub.L. 105–89 (ASFA). ASFA altered the focus of dependency proceedings to include consideration of the need to move children toward adoption in a timely manner when reunification proved unworkable. *See* 42 U.S.C. § 671(a)(15)(C). In doing so, ASFA tied federal funding to a State's adoption of a plan that encompassed the required elements set forth in the ASFA. *See id.* § 671(a). One of the requirements relevant to the current appeal involved the availability of concurrent planning: "In order for a State to be eligible for payments ... it shall have a plan approved by the Secretary which ... provides that reasonable efforts to place a child for adoption or with a legal guardian *may be made concurrently* with reasonable efforts of the type described in subparagraph (B) [to preserve an reunify families.]" *See id.* § 671(a)(15)(F) (emphasis added).

In the years following the federal enactment of the ASFA, Pennsylvania modified its statutes relating to dependent children to comport with the federal provisions. Significantly, Pennsylvania's legislature amended the Juvenile Act in 1998 to include the dual purposes of reunification and adoption rather than merely reunification: "This chapter shall be interpreted and construed to effectuate the following purposes: (1) To pre-serve the unity of the family whenever possible *or to provide another alternative permanent family when the unity of the family cannot be maintained....*" 42 Pa.C.S. § 6301(b)(1) (emphasis added to indicate the amended language).

*In re S.E.G.*, 587 Pa. at 570–572, 901 A.2d at 1019.

¶ 27 In *In re S.E.G.*, the Supreme Court considered the question of whether the agencies and the trial courts have the ability to pursue the dual purposes of reunification and alternate permanency planning through concurrent planning, as required by the ASFA, by allowing the agency to pursue termination without first securing a court-ordered goal change. The Supreme Court held that, pursuant to 42 Pa.C.S.A. § 6351, a court-ordered goal change from reunification to adoption was not a condition precedent to the filing of a petition to terminate parental rights. *In re S.E.G.*, 587 Pa. at 587, 901 A.2d at 1029.

¶ 28 In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary. *In re A.K.,* 936 A.2d 528, 532–533 (Pa.Super.2007). The burden is on the Agency to prove the *change* in goal would be in the child's best interest. *In re Interest of M.B.*, 449 Pa.Super. 507, 674 A.2d 702, 704 (1996) (*citing In Interest of Sweeney*, 393 Pa.Super. 437, 574 A.2d 690, 691 (1990)). In contrast, in a termination proceeding, the focus is on the conduct of the parents as assessed against 23 Pa.C.S.A. § 2511. *In re M.B.*, 674 A.2d at 705.

¶ 29 With regard to a dependent child, in *In re D.A.*, 801 A.2d 614 (Pa.Super.2002), the panel explained:

[A] court is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and con-

vincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

*Id.* at 617.

¶ 30 Regarding the disposition of a dependent child, section 6351(e) of the Juvenile Act provides in pertinent part:

(e) **Permanency hearings.—**

(1) [t]he court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan in a manner appropriate to the child's age and maturity. . . .

(2) If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child has been adjudicated dependent, the court shall then determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the child's parent, guardian or custodian or to preserve and reunify the family shall be made or continue

to be made and schedule a hearing as provided in paragraph (3).

42 Pa.C.S.A. § 6351(e).

¶ 31 Further, regarding permanency, section 6351(f), (f.1), and (g) provides:

(f) **Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

* * *

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical,

mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

\* \* \*

**(f.1) Additional determination.—** Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3) If and when the child will be placed with a legal custodian in cases where return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(5) If and when the child will be placed in another living arrangement intended to be permanent in nature which is approved by the court in cases where the county agency has documented a compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and wiling relative.

\* \* \*

**(g) Court order.—**On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

\* \* \*

42 Pa.C.S.A. § 6351.[5]

¶ 32 In *In re S.B.*, 208 Pa.Super. 21, 943 A.2d 973 (2008), the mother and father of

---

5. The Adoption and Safe Families Act, 42 U.S.C. §§ 671–675, imposes upon states the requirement to focus on the child's needs for permanency rather than the parent's actions and inactions. The amendments to the Juvenile Act, 42 Pa.C.S.A. § 6301–6365, provide that a court shall determine certain matters at the permanency hearing, including whether the child has been placed into foster care for 15 out of the last 22 months. See 42 Pa. C.S.A. § 6351(f)(9). With regard to permanency planning, the Legislature contemplated that, after reasonable efforts have been made to reestablish the biological relationship, the process of the Agency working with foster care institutions to terminate parental rights

the child at issue, S.B., filed an appeal from the order which, after a series of permanency hearings, changed their family goal from "return home" to adoption. The circumstances in *In re S.B.* were similar to the instant appeal. This Court stated:

> The trial court must focus on the child and determine the goal with reference to the child's best interests, not those of the parents. *Id.* "Safety, permanency, and well-being of the child must take precedence over **all** other considerations." *In re N.C.,* [909 A.2d 818, 823 (Pa.Super.2006).] Further, at the review hearing for a dependent child who has been removed from the parental home, the court must consider the statutorily mandated factors. *Id.* "These statutory mandates clearly place the trial court's focus on the best interests of the child." *In re A.K., supra* [906 A.2d 596] at 599.
>
> When parents have cooperated with the agency, achieved the goals of their permanency plans, and alleviated the circumstances that necessitated the child's original placement, the agency should continue to put forth efforts to reunite the child with her parents. *In re A.K., supra.* However, "when the child welfare agency has made reasonable efforts to return a foster child to . . . her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home." *In re N.C., supra* at 823.
>
> Although a goal change to adoption is a step towards termination of parental rights, it does not in fact terminate parental rights. *Id.* When the court allows [the agency] to change the goal to adoption, it has decided "[the agency]

has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition." *In re A.L.D.,* 797 A.2d 326, 339 (Pa.Super.2002). Once the goal is changed to adoption, [the agency] is not required to provide further services. *Id.*

*In re S.B.,* 943 A.2d at 978.

¶ 33 In its analysis in *In re S.B.,* the panel discussed *In re A.K.,* in which the trial court had ordered the goal change to adoption because the parents refused to accept responsibility for the abuse of their children. On appeal in *In re A.K.,* this Court held that there was no continued threat to the children, and that the agency should continue efforts to reunite the children with their mother. The Court found important that the father was imprisoned, and that the mother had been successful in meeting the requirements of her permanency plan, her interaction with the children was appropriate, and a bond with her children was evident.

¶ 34 The panel in *In re S.B.* also discussed the decision in *In re N.C.,* in which the trial court focused on the best interests of the children and granted a goal change to adoption, despite the fact that the mother had made substantial progress toward completing her permanency plan. This Court affirmed the decision, holding that the mother's parenting skills and judgment regarding her children's emotional well-being remained problematic. This Court also reasoned that the trial court's fact-finding process was very thorough and deliberate, as the trial court conducted several hearings with numerous witnesses, and it also considered the input of the guardian *ad litem* as well as the thirteen-

should be completed within eighteen months. *See In re N.W.,* 859 A.2d 501, 508 (Pa.Super.2004) (citation omitted).

year-old child. This Court found the goal change to adoption was in the child's best interests, and affirmed the change.

¶ 35 Against this background, the panel in *S.B.* reasoned:

> The court conducted numerous hearings over the course of three years, and [the agency] continuously offered services to [the mother and father] until the goal changed to adoption. S.B.'s emotional state has not improved to a level that would allow her to be placed with either parent. S.B.'s safety and emotional stability controls the current analysis, even in light of the parents' substantial compliance. S.B. has been in foster care for over four years; the court's decision to change the goal to adoption will permit her to have the long overdue sense of permanency she deserves.

*In re S.B.*, 943 A.2d at 981.

¶ 36 Here, the trial court thoroughly explained its reasoning as follows:

> The uncontested facts demonstrate that Mother failed repeatedly to work consistently or to completion on the goals necessary to support permanent reunification with her three children. She failed to provide adequate supervision for the children. She failed to see that the children attend their therapist appointments. She jeopardized the safety of the children by inviting unauthorized persons, including a convicted felon who was also a fugitive, to stay at her home while her children were present. She consumed illegal drugs in the presence of her fourteen year old son. Mother was habitual in failing to cooperate with the Agency and in intentionally withholding information from the Agency necessary to assure the children's safety. Mother's cooperation was critical to the success of a reunification plan.... "It is not reasonable to suggest that after [many] fruitless years of providing services to [Mother] that the Agency should be expected to continue providing the same services over and over again." ...
>
> The children have remained in limbo due to Mother's failure to achieve stability in her own life so that she could provide a stabile [sic] home for them. This long period of instability has taken its toll on all of the children, but most particularly on the youngest child, J.M. It is time that the children are given a lasting assurance that they will no longer be shuttled in and out of a home which is unhealthy and dangerous to them.
>
> * * *
>
> [B]ecause of Mother's actions and omissions, these three children have been in foster care for the greatest part of the time since August of 2005. They have suffered from cruched [sic] hopes for more than three years because Mother placed her self-interest above the duties of being a responsible parent to her children. Mother has been given more than sufficient time to become a dutiful parent. The best interest of these children will be served by discontinuing further attempts at reunification with Mother.
>
> * * *
>
> All three boys expressed a preference to go home to Mother when interviewed in chambers. The Court discerned that the main reason for such preference was they enjoyed more freedom and less structure, and in some instances[,] no structure, while with Mother.... The children's preference to be with Mother is consistent with a lack of maturity in their reasoning. In their thought, as adolescent and pre-adolescent boys, the absence of rules and chores is more appealing than the structure that their foster parents maintain. [The trial court] is obligated to ensure that the

best interest of these children is served despite the children's preference. After considering the factors which bear on the weight to be accorded to the children's preference and the factors inherent in a best interest analysis, the [trial court] determined that[,] to return these children, now or in the future, to their [m]other would be to their detriment. In addition, the testimony established that Mother coached the children to say they wanted to go home with her. By doing so, Mother imposed her influence to the extent that there is little confidence that the children were able to express their true feelings to the [c]ourt. Despite Mother's imposition of her influence, all three children have expressed that life in their respective foster homes is generally good, albeit with chores and structure. The [c]ourt concludes that the best interest of the children mandates that they not be returned to Mother's custody.

Trial Court Opinion, 10/9/08, at 25–28 (citation omitted).

 ¶ 37 The trial court judge also gave appropriate weight to the Children's preferences, taking into account their age and lack of maturity. *See* 42 Pa.C.S.A. § 6351(e)(1). As this Court has held:

Although the express wishes of a child are not controlling in custody decisions, such wishes do constitute an important factor that must be carefully considered in determining the child's best interest. The weight to be attributed to a child's testimony can best be determined by the judge before whom the child appears. The child's preference must be based upon good reasons and his or her maturity and intelligence must also be considered.

*Ketterer v. Seifert,* 902 A.2d 533, 540 (Pa.Super.2006) (internal quotations and citations omitted). The trial court's determination that Mother had exerted her influence over Children's responses regarding their preferences was based on the trial court's observations, which we will not set aside.

¶ 38 Upon our careful and thorough review of the record in this matter, we conclude that the trial court judge applied the appropriate legal principles to the record, and that his findings are supported by the record. We, thus, accord great weight to the facts which the court found, as the trial court was in the best position to observe and rule on the credibility of the parties and witnesses. *In re C.M.,* 882 A.2d at 513. Accordingly, we conclude that the trial court did not commit an abuse of discretion in changing the goal to adoption instead of reunification. We, therefore, affirm the trial court's order.

¶ 39 Order affirmed.